DECISION
 IN MANDAMUS ON OBJECTIONS TO MAGISTRATE'S DECISION {¶ 1} Relator, Sandra Williams, commenced this original action requesting a writ of mandamus that orders respondent Industrial Commission of Ohio to vacate its order (1) determining that relator was engaged in sustained remunerative work activity during *Page 2 
the time she was receiving temporary total disability and wage loss compensation, (2) finding an overpayment, and (3) finding fraud.
 {¶ 2} Pursuant to Civ.R. 53 and Section (M), Loc.R. 12 of the Tenth Appellate District, this matter was referred to a magistrate who issued a decision, including findings of fact and conclusions of law. (Attached as Appendix A.) In her decision, the magistrate concluded the commission abused its discretion in concluding that the Bureau of Workers' Compensation ("BWC") established either that relator was engaged in sustained remunerative employment during the receipt of compensation, or that relator was engaged in activities outside the physical restrictions arising from her industrial injury. As a result, the magistrate also concluded a finding of overpayment and fraud was inappropriate. The magistrate thus determined this court should issue the requested writ.
 {¶ 3} Respondent Industrial Commission filed objections to the magistrate's findings of fact and conclusions of law:
 [1.] The magistrate's summary of Williams' testimony in paragraph 8 that she obtained orders through her website without doing anything at all and that her husband would take down the information and deliver the product is not an accurate summary.
 [2.] The magistrate's finding in paragraph 8 that Williams substantiated her assertion that "she donates much of the money which she receives from the sale of Mary Kay products to her church" is not supported by the evidence.
 [3.] The magistrate improperly re-weighed the evidence to reach a different conclusion than the commission instead of focusing on whether or not the record contains some evidence to support the commission's findings. *Page 3 
 {¶ 4} The issue before the commission was whether relator's activities in support of her position as an independent beauty consultant for Mary Kay products constituted sustained remunerative work activity that precluded relator's receipt of temporary total disability and wage loss compensations. In that regard, the commission's first objection contends the magistrate inaccurately summarized relator's testimony concerning her Mary Kay business, a business ongoing prior to relator's industrial injury. Specifically, the magistrate's findings of fact states relator "testified that, by having a website, her customers can place orders directly on the website without her (relator) having to do anything at all. Her husband can then take down the information and deliver the product." The commission's objections point out that relator testified she received only one order through her Mary Kay website.
 {¶ 5} The commission's objection is not persuasive. The magistrate accurately reiterated relator's testimony; relator so testified. Relator further testified, however, that by the time she began to receive temporary total disability compensation, she "wasn't able to really do anything. I was pretty much on my back most of the time and I wasn't able to have parties, I wasn't able to deliver products, I wasn't able to just do anything to keep the business running. I wasn't able to check inventory, couldn't sit up long enough to order the inventory * * *." (Tr. at 7.) Relator then explained that her husband, four sons, two nieces, and sister were very helpful in assisting her after her injury, but primarily she relied on her husband and sons. On the testimony presented, any discrepancy between the magistrate's summary and the testimony relator rendered at the hearing is immaterial. The first objection is overruled. *Page 4 
 {¶ 6} The commission's second objection contends the magistrate's statement that relator "donates much of the money which she receives from the sale of Mary Kay products to her church" is not based on evidence in the record. In support, the commission cites relator's testimony that she does not recall how much money she gave to the church. The commission contends that, absent documents to substantiate relator's donations, the magistrate's statement is unwarranted.
 {¶ 7} The commission's objection is not persuasive. As relator notes, she testified concerning a document utilized in the hearing before the staff hearing officer that explained her donations to the church. Accordingly, the magistrate properly could conclude that relator gave portions of her income to charitable institutions. In any event, whether the contributions are substantial does not address or resolve the ultimate issue before us: whether relator was working while receiving temporary total disability and working loss compensations. The second objection is overruled.
 {¶ 8} The commission's third objection challenges the magistrate's conclusion that relator was not working while receiving the noted compensations. The commission maintains the magistrate reweighed the evidence in arriving at that conclusion.
 {¶ 9} Contrary to the commission's objections, the magistrate did not reweigh the evidence. Rather, the magistrate accurately recognized that "[t]he only evidence in the record indicates that her [relator's] family kept the business going after she was receiving temporary total disability compensation. The BWC did not present any other evidence to the contrary. As such there is no evidence in the file upon which the commission could have relied and that is why the magistrate finds that the commission abused its discretion *Page 5 
in finding that she was engaged in some sustained remunerative employment and in declaring an overpayment." (Magistrate's Decision, ¶ 42.)
 {¶ 10} As the magistrate explained, the evidence demonstrated that although relator's family was involved in her Mary Kay business from the beginning, they became significantly more involved once her allowed conditions became disabling. Countering that testimony, the BWC presented little more than evidence that all checks in payment of sold products were made payable to relator; it failed to present any other evidence showing that relator performed any business-related activities in her Mary Kay business or performed any physical activities in connection with the business that were inconsistent with her physical restrictions. As the magistrate further observed, "[a]side from the telephone conversation with Agent Williams, no evidence was presented that showed that relator did anything related to her business as a Mary Kay consultant during the time that she was receiving compensation other than endorsing checks which were made out to her." (Magistrate's Decision, ¶ 39.)
 {¶ 11} Given the absence of evidence to support the BWC's contentions, we agree with the magistrate that relator's income from her Mary Kay business is passive in nature and does not preclude relator's receiving temporary total disability compensation. Accordingly, the third objection is overruled.
 {¶ 12} Following independent review pursuant to Civ.R. 53, we find the magistrate has properly determined the pertinent facts and applied the salient law. Accordingly, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained in it. In accordance with the magistrate's decision, we issue a writ of *Page 6 
mandamus ordering the commission to vacate its order finding an overpayment of temporary total disability and wage loss compensations and to find instead that relator is entitled to the reinstatement of said compensation.
Objections overruled;
 writ granted.
 SADLER, P.J., and KLATT, J., concur. *Page 7 APPENDIX A MAGISTRATE'S DECISION Rendered on February 15, 2007 IN MANDAMUS {¶ 13} Relator, Sandra Williams, has filed this original action requesting that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order which determined that relator had been engaged in *Page 8 
sustained remunerative work activity during the time when she was receiving temporary total disability ("TTD") and wage loss compensation, finding an overpayment, and further finding fraud.
Findings of Fact: {¶ 14} 1. Relator sustained a work-related injury on June 8, 2000, and her claim has been allowed for "sprain lumbar region; L4-5 herniated disc with sciatica." Apparently, relator drove as part of her work assignment for her employer, the Ohio Bureau of Workers' Compensation ("BWC"). Her low back became extremely sore after driving on June 8, 2000, and she has undergone conservative treatment.
 {¶ 15} 2. Relator began receiving TTD compensation in September 2003, as certified by her treating physician Norman Lefkovitz, M.D. Dr. Lefkovitz continued to submit C-84s certifying TTD compensation through an estimated return-to-work date of September 15, 2004.
 {¶ 16} 3. According to the claim summary prepared by the BWC, relator has received TTD compensation from September 30, 2003 through August 4, 2004. Relator returned to part-time/transitional work on August 25, 2004, and received working wage loss compensation from that date through September 4, 2004.
 {¶ 17} 4. In February 2004, the internal affairs department of the BWC received information that relator may be working while receiving compensation and the BWC began an investigation.
 {¶ 18} 5. According to the report prepared by the BWC investigators, relator became an independent beauty consultant for May Kay Cosmetics ("Mary Kay") in April *Page 9 
2002 before she began receiving TTD compensation. The investigation also established that relator has several sales consultants who work under her and from whose services she receives commissions. Those people include: her husband, four sons, two daughters, two nieces, one sister, and a friend at church. The investigators established that, as an independent beauty consultant, relator purchases inventory from Mary Kay at wholesale prices and that relator can then sell the product for any price at or above the wholesale price. The BWC presented a copy of relator's 1099 for the year 2003 which showed $4,745.23 in reportable income from Mary Kay. Because Mary Kay does not keep track of the profit which its consultants make when they resell the product, there is no 1099 to show this amount. However, the BWC was able to present evidence of the summary of relator's orders from Mary Kay during the time period she was receiving TTD compensation. That summary indicates that relator purchased $13,259.89 worth of product from Mary Kay during the relevant time period.
 {¶ 19} 6. The BWC also submitted copies of checks which were made out to relator and which noted that they were for Mary Kay products. Furthermore, it was undisputed that relator did enough business to entitle her to obtain a car from Mary Kay in September 2003. The threshold amount of product to order was $18,000 over a four-month period.
 {¶ 20} 7. In June 2004, agent Williams telephoned relator and spoke with her about her business. Agent Williams sought to purchase some Mary Kay products from relator and ultimately did place an order and made arrangements to have relator deliver the product to her. However, relator's son showed up to deliver the product instead and *Page 10 
relator left a voicemail message apologizing for not being able to deliver the products herself.
 {¶ 21} 8. Relator testified on her own behalf that she began as a beauty consultant for Mary Kay in April 2002, and that she had several other consultants working with/for her. Specifically, relator testified that her family did the majority of the work for her during the contested time period. While relator acknowledged that she did buy enough inventory to qualify for a car, relator testified that, since she received the car, she had not been able to purchase and sell enough inventory in order to qualify to have Mary Kay make the lease payments on the car. As such, relator testified that she and her husband had made all of the lease payments on the car. Relator testified that, during the time she was receiving TTD compensation, all she did was keep track of the inventory. According to her testimony, her husband, sons, daughters, nieces, sister, and church friend took all of the orders, ordered all of the product, and delivered all of the product. Relator did acknowledge that all the checks were make out to her and that she endorsed them all, but that this was because everything was simply run through her name. Further, relator testified that, by having a website, her customers can place their orders directly on the website without her (relator) having to do anything at all. Her husband can then take down the information and deliver the product. Furthermore, relator testified that she donates much of the money which she receives from the sale of Mary Kay products to her church and presented evidence substantiating this. Relator's husband also testified and he indicated that he essentially did all of the work relative to the operation of relator's Mary Kay business. *Page 11 
 {¶ 22} 9. In December 2004, the BWC filed a motion asking that the commission find that relator's TTD and wage loss compensation had been overpaid and further asking for a declaration of fraud.
 {¶ 23} 10. The motion was heard before a district hearing officer ("DHO") on August 10, 2005, and resulted in an order granting the request as follows:
 It is the order of the District Hearing Officer that the C-86 Motion filed by Employer on 12/20/2004 is granted to the extent of this order.
 The District Hearing Officer finds claimant was overpaid Temporary Total Disability Compensation from 10/07/2003 through 08/24/2004 and Wage Loss from 08/25/2005 through 11/13/2004 [sic] because claimant had her own Mary Kay business during these periods and did not disclose this to the Bureau of Workers' Compensation.
 Further the District Hearing Officer finds this overpayment was caused by claimant's fraudulent intentional failure to disclose the material fact that she had her own business on any of the forms relied on by the Bureau of Workers' Compensation to award Temporary Total Disability Compensation or offset a Wage Loss.
 {¶ 24} 11. Relator appealed and the matter was heard before a staff hearing officer ("SHO") on December 5, 2005, and resulted in an order affirming the prior DHO order. The SHO specifically noted that relator had been employed by the BWC and specifically noted that, in her current position, relator was well aware of the rules. Specifically, the SHO noted:
 Ms. Schorr in that e-mail states, "There is no way that as a DMC attached to the claims process as Sandra is would not know the issue of working and drawing temporary total. There is so much focus on it that it cannot be missed either in the line of her particular work or through exposure to all hands, meetings and intrafin." *Page 12 
Further in November 28, 2004, BWC Claims Specialist Supervisor Mellany Dane related an e-mail regarding the claimant's familiarity with the rules and laws regulating the receipt of workers' compensation benefits. "Team 4 in Akron staffed claims on a weekly basis, and Sandra was a part of Team 4 staffing for 1-1/2 years, prior to being transferred to the Canton SO. Temporary total payments and IW working while receiving benefits from BWC were discussed in many of these staffings. All four issues were staffed prior to referral to our fraud department."
Thereafter, the SHO concluded that relator had been overpaid and further that the BWC had established all the elements of fraud:
 The BWC has persuasively provided evidence that the claimant was engaged in sustained remunerative employment during the above periods she received compensation. This evidence consists of checks made out to the claimant relating to the Mary Kay business operations. It further includes affidavits by various customers that relate purchases from the claimant. The BWC submitted evidence from Mary Kay Cosmetics that the claimant did in fact receive income over this period for these transactions. * * *
 * * *
 The Staff Hearing Officer was persuaded by the evidence presented by the BWC and the testimony of Mr. Kenney in which he stated that the evidence presented to the file was conservative in nature in that it only reflected the evidence that the BWC felt was persuasive in relating to the claimant's Mary Kay business activities. Mr. Kenney further testified that there was evidence that was circumstantial and was not presented for the reason that the evidence did not specifically relate to Mary Kay business activities, for example the memo section of a check was left blank.
 The Staff Hearing Officer finds that on average the claimant over this 13 month period in question, would have approximately 10-20 Mary Kay cosmetic transactions in a month. The Staff Hearing Officer takes into consideration that in selling products one often has to solicit a number greater *Page 13 
than the number of sales actually made. Thus, conservatively, the claimant was involved in 10-20 sales in a month and as Mr. Kenney related in his testimony, this number is on the conservative side and could be much greater when one considers the checks in evidence that do not specifically relate to Mary Kay cosmetics and the fact that the claimant would have to solicit a number greater than actual sales when one would consider that not every solicitation results in a sale.
 The Staff Hearing Officer finds the following cases controlling.
 In State ex. Meade v. Industrial Commission, 2005 an employee was engaged in work activity that precluded the payment to him of temporary total disability compensation although he was not compensated in the form of wages, as the activities which he undertook were income-generating for the pizza shop he and his wife owned.
 The court stated that any remunerative activity outside the former position of employment precludes temporary total disability compensation. Activities medically inconsistent with the alleged inability to return to the former position of employment bar temporary total disability compensation, regardless of whether the claimant is paid.
 The file contains eight C-84 forms from Dr. Lefkovitz which state the claimant is temporary total. The dates are 11/10/2003, 10/06/2003, 12/12/2003, 02/09/2004, 03/28/2004, 06/08/2004, 07/28/2004 and 08/04/2004.
 The only restrictions noted on page two of each is "decreased ROM (range of motion) pain low back and RLE pain." These do not provide any lifting, standing, sitting or walking restrictions.
 One must assume that if the claimant is alleging she is unable to perform her former position of employment which was a sedentary position, she would also be precluded from selling Mary Kay products which is also a sedentary position.
 If claimant could and did perform her duties selling Mary Kay products, it is inconsistent that she could also not perform her other job which is also sedentary in strength level. *Page 14 
 For purposes of temporary total disability compensation, in cases where a claimant's alleged work activities involve a business operated or controlled by the claimant, the remunerative issue bears heightened scrutiny. In that situation, the absence of a wage of salary paid to the claimant is not necessarily determinative of the remuneration issue. Furthermore, the absence of profit from the business venture is not necessarily determinative. The issue is whether the claimant was involved in business activities for a financial or remunerative gain, not whether the claimant actually realized any gain or whether the gain was substantial.
 The Staff Hearing Officer further finds the holding in State ex rel. Durant, v. Superior Brands Meats, Inc., 69 Ohio St. 3d 284 (1994) to be controlling as the facts bear a resemblance to the facts at bar.
 In this case, the claimant was involved as a sales representative for Queens-Way.
 In that case, the court rejected the claimant's argument that temporary total compensation is not barred because her earnings did not arise from full time employment.
 The court cited State ex rel. Johnson v. Rawac Plating Co. (1991) 61 Ohio St.3d 599 in holding that part-time work indeed precludes compensation for temporary total compensation.
 It is for the above noted reasons that the BWC C86 motion filed 12/20/2004 is granted to the extent of this order, the overpayment is declared, and the overpayment is to be collected pursuant to the fraud provisions of the Ohio Revised Code.
 {¶ 25} 12. Relator's further appeal was refused by order of the commission mailed January 10, 2006.
 {¶ 26} 13. Thereafter, relator filed the instant mandamus action in this court. *Page 15 
Conclusions of Law: {¶ 27} In order for this court to issue a writ of mandamus as a remedy from a determination of the commission, relator must show a clear legal right to the relief sought and that the commission has a clear legal duty to provide such relief. State ex rel. Pressley v. Indus. Comm.
(1967), 11 Ohio St.2d 141. A clear legal right to a writ of mandamus exists where the relator shows that the commission abused its discretion by entering an order which is not supported by any evidence in the record. State ex rel. Elliott v. Indus. Comm. (1986), 26 Ohio St.3d 76. On the other hand, where the record contains some evidence to support the commission's findings, there has been no abuse of discretion and mandamus is not appropriate. State ex rel. Lewis v. Diamond FoundryCo. (1987), 29 Ohio St.3d 56. Furthermore, questions of credibility and the weight to be given evidence are clearly within the discretion of the commission as fact finder. State ex rel. Teece v. Indus. Comm. (1981),68 Ohio St.2d 165.
 {¶ 28} For the reasons that follow, it is this magistrate's conclusion that this court should issue a writ of mandamus in the present case ordering the commission to vacate its order declaring an overpayment of TTD and working wage loss compensation and finding fraud. As will be more fully explained below, the magistrate finds that the commission abused its discretion in finding that the BWC established that relator was engaged in sustained remunerative employment during the receipt of compensation, failed to establish that she was engaged in any activities that were outside of any physical restrictions and, further, that any finding of fraud would be inappropriate. *Page 16 
 {¶ 29} TTD compensation awarded pursuant to R.C. 4123.56 has been defined as compensation for wages lost where a claimant's injury prevents a return to the former position of employment. Upon that predicate, TTD compensation shall be paid to a claimant until one of four things occurs: (1) claimant has returned to work; (2) claimant's treating physician has made a written statement that claimant is able to return to the former position of employment; (3) when work within the physical capabilities of claimant is made available by the employer or another employer; or (4) claimant has reached maximum medical improvement. See R.C. 4123.56(A); State ex rel. Ramirez v. Indus.Comm. (1982), 69 Ohio St.2d 630.
 {¶ 30} TTD compensation is intended to compensate a claimant for the loss of earnings while the injury heals. State ex rel. Ashcraft v.Indus. Comm. (1987), 34 Ohio St.3d 42. For this reason, TTD compensation ceases when a claimant has returned to work. Ramirez.
 {¶ 31} In Ramirez, the court did not define "work"; however, later cases suggest that remuneration is one key element. See, e.g., State exrel. Nye v. Indus. Comm. (1986), 22 Ohio St.3d 75, and State ex rel.Johnson v. Rawac Plating Co. (1991), 61 Ohio St.3d 599. Further, inState ex rel. Blabac v. Indus. Comm. (1999), 87 Ohio St.3d 113, the court determined that the receipt of wages does not need to be for full-time work in order for TTD compensation to be barred. The court reiterated that Ramirez provides that a return to even part-time work bars the payment of TTD compensation.
 {¶ 32} Thereafter, the court considered several cases wherein an injured worker was also self-employed. In State ex rel. Ford Motor Co.v. Indus. Comm., *Page 17 98 Ohio St.3d 20, 2002-Ohio-7038, the court determined that the claimant's activities did not, in and of themselves, generate any income; instead, the claimant's activities produced money only secondarily. In that case, the claimant owned a lawn care business. As a result of his work-injury with his employer, claimant was not able to continue physically handling his lawn care business and hired three additional employees. The court focused on the following relevant factors: the claimant had removed himself from the physical labor of his business and hired other people to perform that labor; the claimant was not actively engaged in the business; and the claimant's activities, in and of themselves, did not generate income.
 {¶ 33} In State ex rel. Am. Std., Inc. v Boehler, 99 Ohio St.3d 39,2003-Ohio-2457, the claimant maintained his own rental property business separate from his work with his employer, American Standard. Following his industrial injury, the claimant was seen at his properties engaging in the following activities: directing workers, picking up tools and carrying them, passing tools, measuring, pouring paint into a paint spreader, helping to clean up after painting, helping cut boards and put paneling in place, delivering materials to the work site in a truck, and assisting workers to unload equipment. The commission determined that the claimant's activities were reasonable actions of a person who has a substantial capital investment in the form of a passive investment in rental properties, and that such activity did not rise to a level of self-employment as alleged. The Supreme Court of Ohio agreed. The court reiterated that TTD compensation is precluded when the claimant begins to earn again; i.e., when he or she is paid money in direct exchange for labor. The court focused on the following relevant factors: the rental money would have *Page 18 
been received by the claimant regardless of whether the claimant was present at the sites or not; the claimant had to hire contractors to perform the physical labor he formerly performed; the claimant's actions were not physically inconsistent with his medical restrictions; and the rental income was a passive investment.
 {¶ 34} Later, in State ex rel. Meade v. Indus. Comm. (2005), Franklin App. No. 04AP-1184, 2005-Ohio-6206, this court found that the claimant in that case had engaged in activities which constituted work and precluded his receipt of TTD compensation. In Meade, the claimant sustained a work-related injury while employed by Allied Systems, Inc. ("Allied Systems"), and was paid TTD compensation from February 3, 2003 through February 3, 2004. Allied Systems filed a motion requesting that all the TTD compensation paid to the claimant be recouped based on evidence submitted that claimant was working in a self-employed capacity at a pizza shop called Ron's Pizza Enterprises, Inc. ("Ron's Pizza").
 {¶ 35} The record showed that Ron's Pizza had been run by claimant's wife since November 17, 2000. During the time he was paid TTD compensation, claimant was observed at Ron's Pizza taking orders, preparing food, serving customers, working the cash register, and delivering pizzas.
 {¶ 36} This court found that the claimant was indeed engaged in work activity and that, even though the claimant was not being compensated in the form of wages, the activities which the claimant undertook were income generating activities which precluded the payment of TTD compensation. Although the claimant argued that the pizza shop business would have been maintained whether he had been physically present at the *Page 19 
shop or not, and that he did not replace any employees of the pizza shop, this court found that the claimant's activities of preparing food, serving customers, working the cash register, and delivering pizzas are the very activities which generate income for the pizza shop. Unlike the situations presented in Ford and American Standard, this court found that the claimant's hands-on engagement in the activities that produce income for the pizza business are distinguishable from the more passive, supervisory activities at issue in American Standard and Ford MotorCo., activities that produced income only secondarily.
 {¶ 37} In the present case, the commission first cited theMeade case, the facts of which are outlined above, and indicated that case was controlling here. However, as indicated in Meade, although the claimant was not paid for his work, he was observed at the pizza shop taking orders, preparing food, serving customers, working the cash register, and delivering pizzas. Clearly, the claimant was engaged in work activity and, even though he was not being compensated in the form of wages, the activities which he undertook were income-generating activities which precluded the payment of TTD compensation.
 {¶ 38} In the present case, relator was not observed doing any activities. Aside from the telephone conversation with agent Williams, no evidence was presented that showed that relator did anything related to her business as a Mary Kay consultant during the time that she was receiving compensation other than endorsing the checks which were made out to her. Relator did not even deliver the products which agent Williams had ordered; instead, relator sent her son to deliver those products. As such, the *Page 20 
magistrate finds that the facts in the present case are significantly different from the facts in the Meade case and that Meade is not controlling here.
 {¶ 39} The commission also cited State ex rel. Durant v. Superior'sBrand Meats, Inc. (1994), 69 Ohio St.3d 284, and indicated that case is controlling and that the facts bear a significant resemblance to the facts in this case. However, again, this magistrate disagrees. In theDurant case, the claimant began her home-based business in mid-1985 and her employer began paying her TTD compensation in June 1985. In the present case, relator began her home-based business in April 2002 and did not request and receive TTD compensation until October 2003. The magistrate finds that it is significant that relator's home-based business in the present case was already up and running approximately 18 months before she began receiving TTD compensation whereas, by comparison, the claimant in the Durant case began her home-based business at the same time that she began receiving TTD compensation. Furthermore, in Durant, the investigators attended a meeting where it was obvious that the claimant was actively participating in the business. By comparison, in the present case, the investigators attempted to buy product from relator; however, relator did not show up to sell the product. Again, the magistrate finds that this is a significant distinction.
 {¶ 40} Lastly, in Durant, there is evidence by way of the company's publication which revealed how claimant had turned her life around following her work-related injury and how successful she had become in her second career. In the present case, aside from the fact that relator did buy enough inventory to qualify for an automobile, according to her testimony, she had not been able to maintain enough inventory so that Mary Kay *Page 21 
would make the lease payments. As such, the magistrate finds that this case is very different from Durant and that case does not support the commission's conclusion in the present case.
 {¶ 41} In the present case, what the evidence does show is that, before she began receiving TTD compensation, relator became an independent beauty consultant for Mary Kay. Relator's family became involved and, according to her testimony, her family became significantly more involved once her allowed conditions became disabling. Aside from the fact that all the checks were made out to relator, the BWC failed to present any evidence showing that relator performed any business-related activities or any physical activities which were inconsistent with her restrictions in connection with Mary Kay. This money, generated by the efforts of others, is passive in nature. The facts of this case appear more in line with the facts in theFord Motor Co., and American Standard cases where the claimants had their own business before they began receiving any compensation as a result of any work-related injury. The claimants in those cases continued to receive income; however, the evidence indicated that other people did the work. In American Standard, the claimant was even seen helping to cut boards, putting paneling in place, helping to clean up after painting, and assisting workers to unload equipment. Because those activities were not outside of his work restrictions, they were not held against him. Here, relator had an ongoing business as a Mary Kay beauty consultant before she began receiving TTD compensation. The only evidence in the record indicates that her family kept the business going after she was receiving disability compensation. The BWC did not present any other evidence to the contrary. As such, *Page 22 
there was no evidence in the file upon which the commission could have relied and that is why the magistrate finds that the commission abused its discretion in finding that she was engaged in some sustained remunerative employment and in declaring an overpayment. Because there was no overpayment there was no fraud.
 {¶ 42} Based on the foregoing, it is the magistrate's conclusion that this court should issue a writ of mandamus ordering the commission to vacate its order finding an overpayment of TTD and wage loss compensation and ordering the commission to find that relator is entitled to the reinstatement of that compensation.
/s/ Stephanie Bisca Brooks
 STEPHANIE BISCA BROOKS MAGISTRATE *Page 1